MEDMARC.txt

1

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF FLORIDA
2              MIAMI DIVISION

3       CASE NO.: 07-23300-CIV-UNGARO

4
MEDMARC CASUALTY INSURANCE
5   COMPANY,

6          Plaintiff,

7   -vs-

8   ENRIQUE VENTURA, MARIO PINO,
    PMF BUILDERS CORP., PMF BUILDERS II,
9   LLC, and JOSE LUIS FULGUEIRA,

10         Defendant.
    _____/
11

12              ***EXCERPT***

13              DEPOSITION

14                  OF

15       JOHN RAYMOND CARROLL

16

17           September 23, 2008
          (8:51 a.m. - 11:23 a.m.)
18        GONZALO R. DORTA, P.A.
           334 Minorca Avenue
19      Coral Gables, Florida  33134

20

21   Examination of the witness taken before:

22       Julia Y. Alfonso, Court Reporter
          Florida Professional Reporter
23        Network Reporting Corporation
       44 West Flagler Street, Suite 1200
24           Miami, Florida  33130

25

2

1              A-P-P-E-A-R-A-N-C-E-S

2

Page 1

```
                                MEDMARC.txt
 3    On behalf of the Plaintiff:

 4         RONALD L. KAMMER, ESQUIRE
           HINSHAW & CULBERTSON, P.A.
 5         9155 South Dadeland Boulevard
           Suite 1600
 6         Miami, Florida 33156

 7

 8    On behalf of PMF Builders Corp. &
                        PMF Builders II, LLC:
 9
           GONZALO R. DORTA, ESQUIRE
10         GONZALO R. DORTA, P.A.
           334 Minorca Avenue
11         Coral Gables, Florida 33134

12    On behalf of Mario Pino:

13
           RICHARD ALAYON, ESQUIRE
14         BROOKS & ALAYON, LLP
           4551 Ponce de Leon Boulevard
15         Coral Gables, Florida  33146

16    On behalf of Jose Luis Fulgueira:

17
           ROBERT J. HANRECK, ESQUIRE
18         THE LAW OFFICES OF ROBERT J. HANRECK, P.A.
           175 S.W. 7th Street, Suite 1514
19         Miami, Florida  33130

20

21

22

23

24

25
                                                              3



 1                         I  N  D  E  X

 2

 3    DEPOSITION OF JOHN RAYMOND CARROLL

 4                         Direct    Cross    Redirect    Recross

 5
      By MR. DORTA               3
 6

 7
                              Page 2
```

MEDMARC.txt

8

9                     DEFENDANTS EXHIBITS INDEX

10

11          No.                              Page No.

12          1                                    4
            2                                    4
13          3                                    4
            4                                    4
14          5                                    6

15

16

17

18

19

20

21

22

23

24

25

 

                                                                                             4

1              (Whereupon, Exhibits 1 - 4 were pre-marked

2          for identification before going on the record.)

3              THE COURT REPORTER:   Raise your right hand,

4          please.

5              Do you swear to tell the truth, the whole

6          truth, and nothing but the truth, so help you God?

7              THE WITNESS:   Yes.

8      THEREUPON,

9                     JOHN RAYMOND CARROLL

10     was called as a witness, and having been first duly sworn or

11     affirmed, was examined and testified as follows:

Page 3

MEDMARC.txt

12                              DIRECT EXAMINATION

13     BY MR. DORTA:

14         Q     State your name for the record.

15         A     My full name is John Raymond Carroll.

16     C-A-R-R-O-L-L.

17         Q     Sir, have you ever given a deposition before?

18         A     Yes.

19         Q     Okay.  I'm going to ask you a series of

20     questions.  It's going to be limited to the 30(B)6

21     subarea C.  What you have before you premarked as

22     Exhibit No. 1.

23               Have you had an opportunity to familiarize

24     yourself with the area of inquiry for today?

25         A     Yes.

                                                              5


1          Q     Okay.  And what have you done to prepare

2      yourself in order to respond to the area of inquiry

3      which is set forth in the notice of taking deposition,

4      and for the record we've marked as Exhibit No. 1 and

5      it's quote, "Facts, events and circumstances related to

6      the Plaintiff's" -- being Medmarc -- "contention that

7      the malpractice claims are related and/or arise out of

8      common facts, events and/or transactions," close

9      quotes.  Can you tell us what you've done in

10     preparation to address inquiries concerning that

11     subject matter?

12         A     Yes.  I reviewed the operative complaint, the

13     third amended complaint in the case of Pino against

14     Ventura.

15         Q     Okay.

16         A     I reviewed the policy.

MEDMARC.txt

17      Q    Okay.

18      A    Those were the two main things, I think.

19  What else did I review?  I guess I reviewed the

20  declaratory judgment complaint, the reservation of

21  rights letter.  Those were the main things.

22      Q    Okay.  Now, the reservation of the rights

23  letter, since you reviewed it, when was that issued

24  out?  What was the date of that letter?

25          MR. KAMMER:  I think I may have it with me.

6

1          MR. DORTA:  Okay.  Great.

2          MR. KAMMER:  would it be okay to produce?

3          MR. DORTA:  Oh, absolutely.

4          Why don't we go off the record on this.

5          (whereupon, there was an off-the-record

6      discussion.)

7          (whereupon, Defendant's Exhibit No. 5 was

8      marked for identification.)

9  BY MR. DORTA:

10      Q    We've marked Exhibit 5.  Is that the

11  reservation letter that you made reference to that you

12  reviewed in conjunction with the other documents you've

13  identified?

14      A    Yes.

15      Q    Any other documents that you have reviewed to

16  your recollection in preparation for coming forward and

17  addressing the issue set forth in C of our notice of

18  deposition?

19      A    Not specifically in preparation.  It's a

20  while since I looked at the overall file.  So in

Page 5

MEDMARC.txt

21    preparation for today I think I've described documents

22    that I did specifically look at for today.

23        Q    And are you employed, currently employed?

24        A    Yes.

25        Q    With whom?

                                                          7

 1        A    I'm employed by Administrators for the

 2    Professions of Delaware, Inc.

 3        Q    In what capacity?  What job title do you

 4    have?

 5        A    Job title is claims counsel.

 6        Q    Okay.  And how is that company related to the

 7    plaintiff in this case?

 8        A    AFPD is the -- what's the word I'm looking

 9    for?  The administrator of this program of legal

10    malpractice insurance which is underwritten by Medmarc

11    but, which AFPD basically runs the program from soup to

12    nuts, and reports to Medmarc on the results.

13        Q    Okay.

14        A    But Medmarc is the one underwriting those

15    results.

16        Q    So Medmarc is the insurer or issuer of the

17    policy in question and your employer administers the

18    malpractice product of which --

19        A    Yes.

20        Q    -- is encompassed by this policy?

21        A    Yes, right.

22        Q    But there is no formal employment

23    relationship between either you individually or your

24    employer and Medmarc?

25        A    That I believe is correct.
                        Page 6

MEDMARC.txt

```
 1      Q     Okay.  But there is some sort of either
 2   contractual arrangement either oral or in writing
 3   whereby your company acts as a claims administrator in
 4   particular a claims administrator for this claim,
 5   correct?
 6      A     Correct.
 7      Q     And as claims administrator do you simply
 8   just investigate and administer and make decisions on
 9   the claim that is presented or did your employer get
10   involved in the drafting of the policy in question?
11      A     Well, AFPD itself was, I think, the primary
12   mover in the drafting of the policy because, you know,
13   the people at AFPD are the -- they're the legal
14   malpractice.  Medmarc as a company is primarily focused
15   in the medical equipment liability market.  That's
16   basically their thing.  This program is an unusual
17   program from Medmarc, I understand, and basically AFPD
18   runs it, not just the claims administration but also
19   the entire underwriting, accounting, the whole -- the
20   whole program.  The whole program is run by AFPD.  Am I
21   answering your question?
22      Q     Yes.  But let me clarify on one issue.  The
23   whole program means also in respect to the drafting of
24   the policy language of this policy, your employer got
25   involved in that?
```

```
 1      A     Absolutely, yes.
 2      Q     Okay.  Now, who do you report to in Medmarc
```

Page 7

MEDMARC.txt
3   specifically, because you say that you guys need to

4   report to Medmarc?

5        A     Right.  I've just suddenly gone blank on the

6   lady's name.  It will come to me.

7        Q     When it comes to you, just utter it.

8        A     Right.

9        Q     How long have you been working for -- what is

10  it called, Administrators --

11       A     AFPD --

12             MR. KAMMER:  AFPD.

13             THE WITNESS:  -- is what we called it.

14             MR. DORTA:  AFPD.

15             MR. ALAYON:  Association For Professional

16       Disabilities.

17             (Whereupon, there was an off-the-record

18       discussion.)

19  BY MR. DORTA:

20       Q     How long have you been working for AFPD?

21       A     It was about -- it was four years on Labor

22  Day.  I started the day after Labor Day four years ago.

23       Q     Do you have a specific job title?

24       A     Well, the title is claims counsel.  All of

25  our claims people are lawyers so they give us the title

                                                          10


1   of claims counsel.  It's the same thing as claims

2   adjuster except in legal malpractice we like to give

3   ourselves a slightly grandeur title.

4        Q     Are you an attorney?

5        A     Well, I'm a solicitor and I have passed the

6   New York Bar Exam but I never took the trouble to get

7   admitted in New York.

                        Page 8

MEDMARC.txt

```
 8      Q    That's okay.  So you're a solicitor and you
 9   furthermore have successfully passed the New York Bar
10   but you haven't formally been sworn in and gotten the
11   little license, the Bar card?
12      A    Correct.
13      Q    Any other jurisdiction that you've sat for an
14   exam?
15      A    Ireland and New York.
16      Q    Now, we premarked certain documents.  One was
17   the notice of deposition and we already went over that.
18   The second thing that we marked was I believe -- I
19   don't have it here -- the complaint which is before
20   you.
21      A    Okay.  Yes.
22           MR. KAMMER:  I'm just going to make sure.
23      This is 2, right?
24           MR. DORTA:  Yes.
25           MR. KAMMER:  Okay.  It has sticker.
```
                                                                11

```
 1           THE WITNESS:  Exhibit 2, yes.
 2   BY MR. DORTA:
 3      Q    And you identified Medmarc's complaint for
 4   declaratory relief as a document that you reviewed,
 5   correct?
 6      A    Yes.
 7      Q    Then the other thing that we have marked as
 8   the next exhibit, if I am not mistaken, is the
 9   underlying malpractice claim.  And you reviewed that --
10      A    Yes.
11      Q    -- in preparation for the inquiry today?
```
                        Page 9

MEDMARC.txt

12     A     Yes.

13     Q     Okay.

14     A     Exhibit 3, yes.

15     Q     And then the last exhibit that we marked,

16  which is 4, is the insurance policy as it was attached

17  to Medmarc's complaint for declaratory relief.  And my

18  question to you is, is how I presented it and how so

19  marked in this deposition the policy in the form that

20  is kept by either you or the records custodian to your

21  knowledge or is it out of order?  Because to me it's

22  out of order because the way it was in the complaint.

23     A     Well, I see what you mean, I think.  This

24  second part here, beginning with this large print

25  Medmarc Casual Insurance Company.  This is the claim

                                                        12

1   made on reported policy.  This is the beginning of what

2   we normally refer to as the policy jacket, right.  This

3   is the standard language in the policy.

4         MR. KAMMER:  I'm sorry.  Gonzalo, I think by

5      accident there's -- this page shouldn't have been

6      attached to the exhibit.  Can I just remove it

7      so --

8         MR. DORTA:  Oh, absolutely.  I'm presenting

9      it to you so you can remove and clip it the way

10     it's supposed to be.

11        MR. KAMMER:  Yeah.  See, but that was never

12     part of the exhibit.

13        THE WITNESS:  So I guess to answer your

14     question with the way it would normally be kept in

15     the claims file -- well, I shouldn't say that

16     because ordinarily you wouldn't bother putting the

                    Page 10

MEDMARC.txt

```
17        jacket in every claims file but you would in the
18        claims file have put the endorsements, these
19        endorsements which are -- which belong with the
20        policy jacket.  They would certainly be in the
21        claims file.  And the way they're set up here in
22        this exhibit is probably -- I suppose I would have
23        put them the opposite way.  I would have put the
24        endorsement at the end and the jacket at the
25        beginning.
```

                                                                13

```
1    BY MR. DORTA:
2        Q    Okay.  Now, the section that is in question,
3    would that be Section 6, the one that is in question in
4    this dispute of your general conditions?
5        A    Yes.  We're dealing with section 6(C),
6    paragraph C, limited liability each claim.
7        Q    And that would be the general condition which
8    is in dispute in this litigation?
9        A    Yes.
10        Q    This being the Federal court litigation,
11    correct?
12        A    Correct.
13        Q    Now, is it your understanding that Medmarc
14    has contended that the malpractice -- alleged
15    malpractice acts or claims in the underlying state
16    action is related because it arises out of the same
17    fact or occurrence, correct?
18        A    Yes.
19        Q    Now, I am going to focus on what the court
20    has permitted me to focus on which is basically three
```

MEDMARC.txt
21   things under C.  I'm going to break it down this way.
22   I'm going to outline where I'm going so you'll --
23   hopefully to assist.  One, I want you to identify the
24   alleged acts of or omissions of malpractice.  Then,
25   number two, I want you to tell me what is the

0

14

1   commonality, whether in time, facts, occurrence, that
2   makes all these alleged acts of malpractice that's set
3   forth in the state court action one claim or related
4   pursuant to Section C, okay?  So let's start off with
5   my outline.  Number one, can you identify for me the
6   alleged acts of malpractice, because by doing that then
7   you can take me to how they're related.  So let's start
8   off with identify for me the alleged acts of
9   malpractice.

10      A    Right.  Well, what's alleged in the complaint
11   is that Mr. Ventura was nominated by Mr. Martin -- was
12   suggested or recommended to Mr. Pino by Mr. Martin to
13   be Mr. Pino's attorney in the setting up of this
14   corporate entities and to structure this property
15   development that was contemplated.  And it's alleged
16   that throughout the events that transpired that
17   Mr. Ventura pretty much at all stages of this, it's
18   alleged at least, that he had a conflict of interest in
19   that he was supposed to be representing Mr. Pino and
20   the corporation when in fact he was actually
21   representing the interest of Defendant's Martin and
22   Fulgueira.  And throughout the complaint it's alleged
23   that this conflict -- that this conflict that permeated
24   everything he was doing in -- both in relation to PMF I
25   and PMF II was the cause of damage or loss to Mr. Pino
                         Page 12

MEDMARC.txt

15

    1    and the corporations.  And so what we have is a series
    2    of transactions over a period of time in which
    3    Mr. Ventura was acting as the attorney for Mr. Pino
    4    and -- or was supposed to be acting as the attorney for
    5    Mr. Pino and the corporations but because of his
    6    conflict he allowed various things to happen that
    7    shouldn't have happened and which allegedly now cause
    8    the loss that Mr. Pino his complaining of.  So the
    9    picture that's presented by this lawsuit seemed to us
   10    to be a picture of a series of related transactions.
   11    And when it was submitted to us as a claim under the
   12    policy it was submitted as a claim and that is how we
   13    treated it, as a single claim until we reached a point
   14    where I guess you or one of your colleagues raised the
   15    argument that these were actually two claims.
   16        Q    Right.  Let me back it up.
   17             All right.  So the act, the alleged act of
   18    malpractice that you've identified is that of a
   19    conflict of interest which subsequently caused
   20    Mr. Ventura not to discharge his duties?
   21        A    That's at the center of it, yes.
   22        Q    Is that the only act, omission or negligence
   23    that you are aware of that you believe makes these
   24    subsequent transactions related?
   25        A    Well, that's part of it but the events as

16

    1    alleged in the complaint appear to be related in the
    2    sense that they flow from each other.  They're part of

Page 13

MEDMARC.txt

 3    a continuous business relationship involving real
 4    estate development in which Mr. Ventura was at the
 5    center of various transactions over a period of time
 6    all of which were connected to the -- all of which were
 7    related to each other is how they appeared.  All the
 8    events appear to be related as part of a series of
 9    related transactions.

10        Q    Okay.  Let me go back.  So then the only
11    alleged act of negligence that you have identified is
12    the conflict of interest which you say is at the center
13    of it.  Are there any other acts or omissions that is
14    allegedly charged against Ventura for the malpractice
15    that I need to look at in order to then determine how
16    they're related?  You've identified a conflict of
17    interest.

18        A    Yes.

19        Q    That's one act of negligence, undertaking
20    representation when there's a conflict of interest.
21    What other act or omission of Ventura is an alleged act
22    of negligence or malpractice?

23             MR. KAMMER:  Objection.  Asked and answered.
24        You can answer again.

25

                                                           17

 1    BY MR. DORTA:
 2        Q    If it's only conflict of interest tell me,
 3    Look, it's only conflict of interest.
 4             MR. KAMMER:  He can answer again.
 5             THE WITNESS:  Well, for example, the
 6        diversion of money from PMF I purchasers to the
 7        use of the -- towards the creation of PMF II and

                            Page 14

MEDMARC.txt

```
 8        the way that PMF II was structured, which was
 9        allegedly contrary to what Mr. Pino had envisioned
10        and expected.  That diversion of -- Mr. Ventura
11        allowed his escrow accounts to be used in a manner
12        that was, again, causing loss to Mr. Pino and
13        that, you know, that's negligence on his part
14        which results in loss and it's related to the --
15        it's related to the conflict of interest.  It's a
16        negligent event related to the overall series of
17        transactions.  That's one of them, the diversion
18        of money, the bank money that should have gone to
19        PMF I.  And if we look at the other very specific
20        acts of negligence that are alleged, they seem to
21        be also part of the -- they all seem to be tied up
22        together into one problem.
23   BY MR. DORTA:
24        Q    Okay.  I haven't gotten to phase two of the
25   analysis.  I'm trying to -- in order to understand your
```
                                                              18

```
 1   condition which talks about related act or omissions,
 2   okay --
 3        A    Right.
 4        Q    -- under your policy.  I want you to identify
 5   all the acts or omissions which make up what you all
 6   deem to be the professional services that are logically
 7   or causally connected by a common fact.  So we've
 8   already talked about conflict of interest.  We've
 9   talked about diversion of funds.  What other act or
10   omission on the part of Ventura is involved in your
11   analysis?
```
                         Page 15

MEDMARC.txt

12          MR. KAMMER:  I object to the form.  I think
13      that mischaracterizes his prior testimony because
14      he did name some other things, but he can keep
15      answering.
16          THE WITNESS:  Well, I mean, if we were to go
17      through the complaint, which it's a very long
18      complaint, just picking at random --
19  BY MR. DORTA:
20      Q    I don't want you to pick at random.  Let me
21  focus you on this.  We're concentrating only in section
22  C of the notice, the 30(B)6 notice.  I need to first
23  know, at least for purposes of a meaningful examination
24  from my perspective, all acts or omissions of Ventura
25  that you claim are logically or casually connected by a
                                                        19


1   common fact, circumstance or situation.  And what I'm
2   reading from, Ray, is that definition that you all have
3   in your policy, the same area of related act or
4   omissions.  It's found on page six in your lawyer's
5   complaint which is.
6       A    Page six of the complaint, right.
7       Q    It makes it easy for you.  It's fully quoted
8   in page six of the complaint --
9       A    Right.
10      Q    -- m.  You see M on page six of the
11  complaint?
12      A    Right.
13      Q    It talks about related acts or omissions.
14      A    Yes.
15      Q    For us to reach that conclusion, I need for
16  you to identify all the acts or omissions --
                        Page 16

MEDMARC.txt

17    A    Right.

18    Q    -- that make up the professional services for

19  which Ventura has been alleged to have, you know, not

20  performed correctly.

21    A    Right.

22    Q    All right.  So my notes indicate we have

23  conflict of interest, a diversion of money and I missed

24  the other ones.  Are there any others?  Because your

25  counsel said that you've identify others.  Are there

                                                        20

1  any others so I can write them down?

2    A    Yes.

3        MR. KAMMER:  Objection.  Asked and answered.

4        You can answer again.

5        THE WITNESS:  Basically everything that's

6        alleged against Mr. Ventura.  The way PMF I was

7        set up giving Martin and Fulgueira shareholdings,

8        that was not what Mr. Pino -- the setting up of

9        PMF I giving shares to Martin and Fulgueira was

10       not at all what Mr. Pino expected or wanted or has

11       instructed Ventura to do, they were supposed to be

12       a profit sharing deal according to Mr. Pino.  They

13       were supposed to get a share of profits but not an

14       ownership interest in the corporation.  And then

15       when they came to set up PMF II, something similar

16       happens whereby Martin and Fulgueira again got a

17       shareholding when Mr. Pino's understanding was

18       that they were going to get a profit participation

19       and that he would be the sole shareholder.  And so

20       the two projects -- essentially Mr. Ventura made

                          Page 17

MEDMARC.txt

```
21      the same error for want of a better word involving
22      the same parties and involving the same --
23      basically the same background type circumstances.
24      And then it's alleged that he allowed Fulgueira
25      and Martin or certainly Martin to take money from
```

0

                                                                        21

```
 1      PMF II that should have been kept in escrow and he
 2      allowed that money to be taken and used by
 3      Fulgueira and Martin for their corporation, again,
 4      without Mr. Pino's knowledge or his consent and
 5      contrary -- as I understand it, contrary to what
 6      Mr. Ventura was retained to do.  And so,
 7      throughout the complaint it's alleged that
 8      Mr. Ventura made various errors, different kinds
 9      of errors like at different times but all to the
10      detriment of Mr. Pino and all to the benefit or
11      apparent benefit of Messieurs Martin and
12      Fulgueira.
13   BY MR. DORTA:
14      Q    All right.  Is it your understanding that
15   Mr. Ventura had an attorney-client relationship with
16   Pino?
17      A    That's my understanding, yes.
18      Q    Is it your understanding that Mr. Ventura had
19   an attorney-client relationship with Fulgueira?
20      A    Well, I'm not sure but it seems to be alleged
21   that, in fact, he was -- he was in fact representing
22   Fulgueira's interest but primarily Martin's interest,
23   that it seems as though he was certainly representing
24   Martin but also Fulgueira's.  I'm not 100 percent clear
25   on that.
```

MEDMARC.txt

1      Q    But your analysis that these acts are related

2    arises from your review of the underlying complaint or

3    did you also have that understanding for purposes of

4    today's examination from reviewing any deposition

5    transcript given by any witness in the case?

6      A    No.  I don't think I have reviewed any

7    deposition transcripts.  Certainly not in this action

8    that we're in now.

9      Q    Okay.

10     A    I don't specifically remember reviewing

11   complete transcripts of any depositions.

12     Q    All right.  So your analysis here today for

13   purposes of the inquiry under Section C is basically

14   the documents that you have identified today which

15   would include the complaint, correct?

16     A    Correct.

17     Q    And what you have been sharing with me today,

18   identifying the acts or omissions of alleged negligence

19   comes from your understanding of what is alleged in the

20   complaint, correct?

21     A    Correct.

22     Q    Okay.  And the complaint being the state

23   action?

24     A    Correct.

25     Q    Okay.  And it's based on the allegations of

23

1    the state action complaint that you believe there was

2    an attorney-client relationship between Ventura and

Page 19

MEDMARC.txt
```
 3   Pino, Ventura and Fulgueira and Ventura and Martin,

 4   correct?

 5        A    Yes.

 6             MR. KAMMER:   Object to the form.

 7             THE WITNESS:   Yes.

 8             MR. KAMMER:   That's fine.   All right.

 9             THE WITNESS:   That's my understanding of

10        what's alleged, yes.

11   BY MR. DORTA:

12        Q    And is it your understanding based upon the

13   documents that you have reviewed as a 30(B)6 deponent

14   for which I am examining you today that there was a

15   attorney-client relationship between Ventura and what

16   you call PMF I which is PMF Builders, Corp?

17        A    Yes, that's my understanding.

18        Q    All right.   And is it your understanding that

19   there was an attorney-client relationship between

20   Ventura and PMF No. 2?

21        A    Yes, that's also my understanding.

22        Q    Okay.   Is it your understanding that the

23   attorney-client relationship that we have identified

24   for the individuals and the corporate entities PMF, all

25   arose at the same time?
```
                                                         24


```
 1        A    Well, not necessarily.   Not -- no, almost

 2   certainly not.

 3        Q    Let's focus on the PMF entities starting with

 4   PMF I.   Were the legal services or professional

 5   services that Ventura provided PMF I the same as what

 6   he provided to Pino?

 7             MR. KAMMER:   Can I have the question read
```

MEDMARC.txt

```
 8        back, please.
 9              (Whereupon, the previously recorded question
10        was read back.)
11   BY MR. DORTA:
12        Q    Well, if you are requesting me to read it
13   back it's because I didn't properly phrase it.
14              Let's talk about the nature of legal
15   services.  I'm going to start with PMF I, okay, Ray?
16        A    Yes.
17        Q    And my question is the following:  Is it your
18   understanding that the legal services that attorney
19   Ventura furnished to PMF I the same type of legal
20   services that he furnished to Pino?
21        A    Probably speaking I would say yes.
22        Q    Why would you say that?
23        A    Because in a sense I suppose Pino thought the
24   corporation would be kind of alterego.  It would be his
25   corporation.  It would be set up to run the business he
```
25

```
 1   wanted to do which is the development of this real
 2   estate.
 3        Q    Okay.  Let's talk about harm.  Was the harm
 4   alleged by PMF I against the acts or omissions of
 5   Ventura the same harm that Pino suffered as a result of
 6   Ventura's malpractice in connection with the services
 7   he furnished to Pino?
 8        A    Was the harm the same -- was it the same harm
 9   caused by the work done for PMF I as the work done for
10   Mr. Pino himself?
11        Q    Right.
```

MEDMARC.txt

12    A    That's the question?

13    Q    Right.

14    A    I'm at a loss to try to put myself in the

15    shoes of the corporation versus Mr. Pino as to who was

16    suffering the damage.  I suppose in the long run any

17    damage to the corporation would have been damage to

18    Mr. Pino.

19    Q    Okay.  Now, let's now take it to PMF II.  Is

20    it your understanding that the development where PMF I

21    was a developer and seller the same type of development

22    that PMF II was engaged in?

23    A    I'm sorry.  I'm sorry.  If you could read

24    that question back.  I just wasn't listening for a

25    second.  My mind --

26

1    Q    I'll go ahead and rephrase it.  Don't worry

2    about it.  What's your understanding of the development

3    that PMF I was organized to pursue?

4    A    It was to buy land and build residential

5    houses on the land and sell those residential units.

6    Q    Okay.  And when did PMF I start to develop

7    the land in order to effectuate those home sales?  Do

8    you remember the month and year?

9    A    I'm sorry I don't.

10    Q    Okay.  Fair enough.

11         And how many homes did PMF develop in this

12    project?

13    A    I'm going to say about -- somewhere between

14    60 and 80.  Those numbers come into my head.

15    Q    Okay.  And were all those homes closed?  Was

16    the project completed and sales done?

MEDMARC.txt

```
17    A    I believe they were.
18    Q    And who was the lender on the PMF I project?
19    A    That was Regions Bank.
20    Q    And who was the general contractor in that
21 project?  Do you know?
22    A    I believe -- oh, I'm not sure.
23    Q    Fair enough.
24    A    I'm not sure.
25    Q    And are you aware of any dispute between the
```

27

```
1  buyer and seller in the PMF I project?
2         MR. KAMMER:  Can I have a clarification.  Who
3     do you mean by buyer and seller, Gonzalo?
4         MR. DORTA:  Yes, sir.  The seller being PMF I
5     who was the owner of the land and the buyer is any
6     home buyer that is a contract buyer.
7         MR. KAMMER:  Okay.
8         MR. DORTA:  I just don't know them by name.
9         MR. KAMMER:  That's fine.  I wasn't sure what
10     you meant.  I appreciate the clarification.
11 BY MR. DORTA:
12    Q    Let me rephrase it because it was a bad
13 question, then.
14         All right.  Are you aware with respect to the
15 PMF I project, Ray, whether any dispute arose between a
16 buyer and the seller, the seller being PMF I, a dispute
17 of any nature?  Title dispute, you didn't release the
18 lien, any sort of dispute?
19    A    Well, I'm aware of the dispute involving the
20 channeling of the money -- of the balance of the
```

Page 23

MEDMARC.txt
21    purchase prices of about -- I think it was about 14 or
22    15 homes where instead of the money going to Regions to
23    pay off the loan on PMF I this money was diverted so to
24    speak to PMF II.  And it's alleged that Ventura --
25    Mr. Ventura made an error in allowing that to happen

28

1    without a written -- without any written assurance from
2    Regions Bank that this was permissible and apparently
3    without Mr. Pino's knowledge or approval of the way the
4    money was used.
5        Q    But are you aware of any buyer suing PMF I as
6    a result of any act or omission or not good title in
7    any of the closing?
8        A    I don't recall that as being an issue.
9        Q    And we're focusing on the PMF I project which
10   you know to be Cedars Grove, correct?
11       A    Correct.  Right.
12       Q    In the PMF I project, are you aware of any
13   buyer accusing Ventura or anyone of misappropriating
14   their escrow moneys or deposit moneys?
15       A    Not on PMF I.  I don't recall any.
16       Q    Are you aware of any home that did not close
17   as a result of any act or omission by Ventura in Cedars
18   Grove?
19       A    As I sit here right now, I'm not.
20       Q    Do you know if PMF I realized a profit as a
21   result of the sales of the homes?
22       A    My understanding is that it was a very
23   profitable venture.
24       Q    Now, let's go to PMF II.  It's your
25   understanding based on the allegations of the complaint
                        Page 24

MEDMARC.txt

29

1   that PMF II Corporation was at some point in time

2   incorporated, correct?

3       A    Correct.

4       Q    And you will agree that PMF II was

5   incorporated after PMF I was created?

6       A    Yes, that's true.

7       Q    What is your understanding as to the month

8   and year that PMF II was created?  Do you have any

9   idea?

10      A    I don't have those dates.

11      Q    That's fair enough.

12          Do you know if the Cedars Grove project had

13  already been sold out when PMF II was organized or you

14  don't know?

15      A    I would say my impression is if it wasn't

16  entirely sold out it was looking like a very successful

17  project.

18      Q    Do you recall Mr. Ventura providing services

19  to these three individuals in connection with drafting

20  a shareholder agreement?

21      A    For PMF II.

22      Q    Okay.  Do you recall if he prepared a

23  shareholder agreement for PMF I?

24          MR. KAMMER:  Objection, asked and answered.

25      You can answer again.

30

1           MR. DORTA:  Oh, he did answer that?

2           MR. KAMMER:  I think he did but if he

MEDMARC.txt

3      didn't --

4           MR. DORTA:  He said PMF II he prepared

5      shareholder agreement.  I want to know if he did

6      the same thing on PMF I.

7           MR. KAMMER:  Okay.  So you understand.

8      Whenever I'm objecting asked and answered, I'm

9      always going to let him answer the question again.

10     I'm just doing it to protect the record because,

11     you know --

12          MR. DORTA:  I just don't want to ask the same

13     question if I asked it before.

14          MR. ALAYON:  I think you should let him have

15     a standing asked and answered objection.

16          MR. DORTA:  No, because he helps me out.

17     Because if I asked the question before, it's not

18     right to ask it again.

19          MR. KAMMER:  But that's not the reason.  It's

20     just in case his answers are not the same.  That's

21     the only reason.  No offense to my esteemed

22     witness here but that's the only reason I'm

23     objecting here.  He can always answer.

24          (Whereupon, there was an off-the-record

25     discussion.)

                                                    31


1      BY MR. DORTA:

2           Q    All right.  Let me go back on the record.

3      Okay, Ricky.  Here we go because we're trying to get

4      everybody out of here.

5                You recall that as to PMF II a shareholder

6      agreement was prepared for the individual shareholder

7      of that company, correct?

                      Page 26

MEDMARC.txt

```
 8        A     I believe so, yes.
 9        Q     Now I'm going to focus you back to PMF I.  Do
10   you know if a shareholder agreement was prepared by
11   Ventura when he set up PMF I or at any point in time?
12              MR. KAMMER:  Same objection.  You can answer.
13              THE WITNESS:  My understanding is that he
14        did.
15   BY MR. DORTA:
16        Q     He did.
17              All right.  And do you recall whether or not
18   any of the individual defendants alleged that the way
19   he did the shareholder agreement as it pertained to PMF
20   I was incorrect or not up to the standard that he
21   should have adhered to?
22              MR. KAMMER:  Same objection.  You can answer.
23              THE WITNESS:  Yes.  I did try to answer that
24        before, I think, in the sense that Mr. Pino
25        certainly felt that the shareholder agreement
```
                                                        32

```
 1        didn't comport to what he understood or expected
 2        and wanted.
 3   BY MR. DORTA:
 4        Q     Is it your understanding that the corporate
 5   entity, PMF I, is charging Ventura with any act or
 6   omission in preparing any documents with respect to the
 7   incorporation of PMF I?
 8        A     I don't recall that specifically as an
 9   allegation in that way.
10        Q     Is it your understanding that PMF I is
11   claiming in the underlying case that Ventura
```
                         Page 27

MEDMARC.txt

12    inappropriately drafted the sales contract that was
13    used in the Cedars Grove project?
14        A    The sales contract for individual homes?
15        Q    Yes, the standard sales contract.
16        A    I don't recall that being an issue.
17        Q    Are you aware whether or not PMF I claimed
18    that Ventura mishandled title insurance as it pertained
19    to the closings of PMF I?
20        A    Well, there was an issue with a title company
21    lawsuit which I don't know what happened to it.
22        Q    Okay.
23        A    But there was a lawsuit at one point by the
24    title company.
25        Q    Okay.

33

1         All right.  Are you aware of any allegation
2    by PMF I that Ventura messed up in the preparation of
3    any warranty deeds or closing documents?
4        A    No, I'm not aware of those.
5        Q    Now, let's go to PMF II.  PMF II, is it your
6    understanding that they were going to develop a
7    condominium there?
8        A    Yes.
9        Q    And is it your understanding that Ventura
10   prepared condominium documents?
11       A    I believe he did.
12       Q    When he prepared the condominium documents,
13   who was his client with respect to those services?  If
14   you know.
15       A    Well, I suppose his client was PMF II by one
16   measure, but of course it's alleged that he was really

Page 28

MEDMARC.txt

17    representing the interest of Martin and Fulgueira

18    throughout this but he should have been representing

19    PMF II and I suppose Mr. Pino.

20         Q    All right.  So it's your understanding that

21    when he actually prepared the condo docs, the services

22    he was furnishing was to his client PMF II?

23         A    PMF II.  That would be -- yeah.

24         Q    And when he was preparing the standard

25    condominium sales contract his client with respect to

34

1    those services would be PMF II?

2         A    Yes.

3         Q    Okay.  And when he took on any buyer's

4    deposit his client in that process would be PMF II?

5         A    His direct client would be PMF II, yes.

6         Q    And is it your understanding that in the

7    organization of PMF II Mr. Ventura provided personal

8    services to Fulgueira, Pino and Martin, correct?

9         A    That certainly was alleged, yes.

10        Q    And those services included preparation of

11    documents, i.e, a shareholder agreement as it pertained

12    to the three shareholders, correct?

13        A    Correct.

14        Q    And in that instance PMF II was not his

15    client when he was preparing the shareholder's

16    agreement?

17             MR. KAMMER:  Objection to the form.  You can

18        answer.

19             THE WITNESS:  Well, I suppose he was in a

20        conflict situation.

Page 29

MEDMARC.txt

21  BY MR. DORTA:

22      Q    But my question is when he's preparing the

23  shareholder agreements for the individual shareholders,

24  the client and recipient of that service would be the

25  individuals, correct?

0

35

1          MR. KAMMER:   Objection to the form.   You can

2      answer it.

3          THE WITNESS:   Yes.   I suppose it depends how

4      you look at it.

5  BY MR. DORTA:

6      Q    Well, I want you to see how you look at it

7  because you're the 30(B)6 representative.

8      A    Well, I suppose in an ideal case where an

9  attorney is doing work for a newly formed corporation,

10  there's always a sense in which he's representing the

11  principals in a sense because they're the people who

12  would be running the corporation.   But I suppose in a

13  strict legal sense his client is the corporation so

14  that in this instance he should have had the

15  corporation's interest as his first priority.   They

16  were his nominal client.

17     Q    Who paid Ventura when he prepared the

18  condominium documents?   Was it PMF II or some other

19  person, if you know?

20     A    I don't know.

21     Q    All right.   Who paid Ventura when he prepared

22  the standard condominium purchase and sale agreement to

23  be used for the condominium project?   Was it PMF II or

24  some other entity or some other person.   If you know?

25     A    I don't know.

                    Page 30

MEDMARC.txt

36

```
 1      Q     All right.  When PMF II started to accept
 2   deposits from prospective condo buyers, Cedars Grove
 3   project had already been consummated, correct?
 4      A     Correct.
 5            MR. KAMMER:  Objection.  Asked and answered.
 6   BY MR. DORTA:
 7      Q     And when did Ventura accept the first buyer
 8   deposit for the condominium project?  Do you know?
 9      A     I don't have the dates in my memory, sorry.
10      Q     To your understanding Ventura acted or his
11   company acted as the escrow agents on these deposits?
12      A     Yes, he did.
13      Q     Was it his P.A. that acted as the escrow
14   agent or was it Ventura individually or some title
15   company or you don't recall?
16      A     I thought it was his P.A.
17      Q     Okay.  When he's accepting these escrow
18   deposits, it's on behalf of the developer, being PMF
19   II, correct?
20      A     Correct.
21      Q     Is it your understanding that a dispute arose
22   in that condominium project between the developer and
23   the buyers?
24      A     That's correct.
25      Q     What's your understanding of the nature of
```

37

```
 1   the dispute that arose in that project between buyers
 2   and developer seller?
```

Page 31

MEDMARC.txt

3      A     The deposit moneys that buyers of PMF II

4   deposited and the moneys that went into Mr. Ventura's

5   escrow account was improperly spent in developing PMF

6   II when that money or at least a significant chunk of

7   that money should not have been touched and Mr. Ventura

8   shouldn't have allowed anyone to touch that money.  So

9   that buyer's money was used for improper purposes and

10  of course now they want it back.

11     Q     Right.  And the buyers claim that the

12  developer seller PMF II improperly used their deposits,

13  correct?

14     A     Yes.

15     Q     Okay.  Now, a similar dispute, namely,

16  between the buyer, seller developer did not occur in

17  Cedars Grove?

18     A     As far as I know, no.

19     Q     Is it your understanding that subsequently a

20  receiver was appointed over this condo project, PMF II?

21     A     Yes.

22     Q     Was a receiver ever appointed in the project

23  of PMF I?

24     A     No.

25     Q     Is it your understanding that the title

                                                         38


1   insurance company intervened in the condominium dispute

2   with the buyer and developer?

3      A     Yes, but my memory of that is very vague.

4   There was a title company involved in it but the full

5   details I don't recall.

6      Q     Do you know if the title company involved in

7   the closings of Cedars Grove ever filed a motion to

MEDMARC.txt

8   intervene or complaint to intervene?

9       A    As far as I know there was no problem there.

10      Q    What is your understanding of the dispute

11  between the individual shareholders as it pertained to

12  the condominium project involving PMF II?

13      A    Well, when it was -- when PMF II -- when

14  Mr. Ventura set up PMF II, he allocated one-half of the

15  shareholding to Mr. Pino and the other half divided

16  between Mr. Fulgueira and Mr. Martin.  And that again

17  was contrary -- and that was contrary to what Mr. Pino

18  had wanted and what he understood to be happening.

19  Again in this case also my understanding was that

20  Mr. Pino thought that he would be the sole shareholder

21  and that the other two gentlemen would be profit

22  sharing but not equity owners.

23      Q    Is that the nature of the same dispute

24  between those three individuals in connection with

25  Cedars Grove?

                                                    39

1       A    It's a similar situation.

2       Q    And why do you say that?

3       A    Well, in both cases -- in both cases the

4   ownership interest was set up to favor Martin and

5   Fulgueira over Mr. Pino.

6       Q    And your understanding is that that is a

7   similar type of dispute that arose in the condominium

8   project?

9       A    It's probably similar in terms of the issue

10  of ownership, yes.

11      Q    All right.  Now, I have two --

                    Page 33

MEDMARC.txt

12        A    Is it okay to take a break?

13        Q    I'm sorry.  I have two more issues and I'm

14    done.

15             (Whereupon, there was a brief recess.)

16    BY MR. DORTA:

17        Q    Ray, do you know the amount of damages that

18    PMF I is claiming against Ventura for his malpractice

19    against PMF I?

20        A    PMF I damages -- the amount of PMF I's

21    damages claimed.  Off the top of my head I believe it's

22    in excess of $1 million.

23        Q    Do you know the nature of the damages that

24    PMF is claiming?  By nature, I mean, can you give me a

25    description of the item of damages that PMF I is

                                                        40


1     alleging?

2         A    PMF I?

3         Q    That's Cedars Grove.

4         A    Cedars Grove.  Well, my overall understanding

5     is that PMF I has a complaint about the diversion of

6     the Regions Bank money from PMF I into PMF -- that

7     would be a beef for PMF I, I suppose.

8         Q    Yes.  But what is the nature of the damages

9     that PMF I is claiming?  Is it claiming loss profits?

10    Is it claiming that it had incurred additional

11    attorney's fees to fix title?  What is the type of

12    damages, the nature of the damages, that PMF says it

13    suffered as a result of the Ventura's acts or

14    omissions?

15        A    I think that it relates to the problem with

16    Regions Bank and the fact that Regions wasn't

MEDMARC.txt

17    immediately paid the purchase moneys of the last 16 --
18    I think it was the last 16 purchasers.
19        Q    All right.  So what's the nature of the
20    damages that PMF suffered as a result of that omission
21    by Ventura?  Was it loss profits?  Was it additional
22    interest?  Was it damage to its credit rating?  Was it
23    destruction of the banking relationship?
24        A    Well, yes, but that's inextricably linked or
25    is it linked to Mr. Pino's claim for damages for those

                                                              41

1     same headings.  Mr. Pino is also claiming that his
2     credit was damaged and as well I guess PMF I's also.
3     But I'm not clear precisely on the flow of damages that
4     they're alleging as distinct from the damages that
5     Mr. Pino is alleging.
6         Q    Now let's go to PMF II.  Can you tell me the
7     total sum of money that PMF II is alleging in the form
8     of consequential or special damages as a result of any
9     alleged act or omission by Ventura?  If you know.
10        A    The amounts I don't remember, but they're
11    significantly large amounts, I believe.
12        Q    Now let's go to the second inquiry.  Do you
13    know the type of damages or injury that PMF II is
14    alleging that Ventura caused PMF II?
15        A    Well, it's alleged that he allowed their
16    depositors' money to be improperly used.
17        Q    No, I understand the act or omission.  But I
18    want to know what type of damages flowed from that
19    diversion to PMF II.  Loss of credit rating?
20        A    Yes, I think loss of profits and the collapse

                          Page 35

MEDMARC.txt
21   of the whole venture I think is being laid on

22   Mr. Ventura's door.

23        Q    Now, loss of profits was not a type of damage

24   that PMF I realized because you earlier testified that

25   they made money in the PMF project?

42

 1        A    I believe they did, yeah.

 2        Q    Now, my last issue and I'll turn it over to

 3   my colleagues. You early on in this examination

 4   referred to the fact that the claims by these different

 5   entities, PMF entities, and these different

 6   individuals, Fulgueira, Pino and Martin, were in a

 7   single complaint. Is that a factor that you contend

 8   makes it a related claim?

 9             MR. KAMMER:   Object to the form.  You can

10        answer.

11             THE WITNESS:   I suppose it's a clue.  It's a

12        clue that makes you start thinking that way from

13        the outside, yes.

14   BY MR. DORTA:

15        Q    If Martin would have sued independently, if

16   Fulgueira would have sued independently --

17             MR. HANRECK:   Form.

18   BY MR. DORTA:

19        Q    -- if PMF I would have sued independent, PMF

20   II, would you still maintain they were all related

21   claims?

22             MR. KAMMER:   Objection to the form.

23             THE WITNESS:   Well, yes.  And I think the

24        first thing probably a defense lawyer defending

25        Mr. Ventura would do in that situation would be to
                              Page 36

MEDMARC.txt

43

```
1      move to consolidate the various claims into one
2      act.
3   BY MR. DORTA:
4      Q    I'm not asking what procedure because you're
5   a fact witness and I was told I couldn't ask you legal
6   questions, so don't volunteer a legal analysis.
7      A    I'm sorry.
8      Q    No, I'm helping you out because it's not
9   going to be fair to you.
10          If the claims that are contained in this
11  single complaint would have been memorialized in
12  separate complaints, a complaint of Pino vs. Ventura, a
13  complaint of PMF I vs. Ventura, a complaint of PMF II
14  v. Ventura, Martin vs. Ventura, Fulgueira vs. Ventura,
15  you as a fact witness, 30(B)6 deponent, would you
16  maintain that notwithstanding the separate complaints
17  they all arise from a same nucleus of facts?
18      A    Yes.
19          MR. KAMMER:  Objection to the form of the
20      question and his answer was yes.  We all spoke at
21      the same time.
22  BY MR. DORTA:
23      Q    Is your answer yes?
24      A    Yes, my answer would be yes.
25      Q    Now, lastly, that last issue.  Your letter
```

44

```
1   that we marked -- I guess, Counsel, it would be Exhibit
2   5?
```

MEDMARC.txt

```
 3               MR. KAMMER:  Five.
 4    BY MR. DORTA:
 5       Q     Your reservation letter.  Is this a letter
 6    that Medmarc approved either through your offices or
 7    directly from them?
 8       A     It was approved through my office to me.
 9       Q     And you considered this reservations letter
10    in your review to prepare yourself to answer the
11    questions --
12       A     Yes.
13       Q     -- that you're being asked today?
14       A     Yes.
15       Q     And you would agree that in this letter the
16    writer of the letter identifies separate acts of
17    malpractice, some of which that are covered, some of
18    which that are not covered, different claims and
19    demands, correct?
20       A     Correct.
21               MR. KAMMER:  Object to the form.
22    BY MR. DORTA:
23       Q     You would agree that from the commencement of
24    PMF I through PMF II there are separate claims that
25    arose from this sequence of events, correct?
```

                                              45

```
 1               MR. KAMMER:  Objection to the form.
 2               THE WITNESS:  I suppose, yes.
 3               MR. DORTA:  I turn it over to my colleagues.
 4        Thank you for your time, sir.
 5               **********************************
 6
 7
```
                        Page 38

MEDMARC.txt

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

46

1   THE STATE OF FLORIDA)
    COUNTY OF MIAMI-DADE)
2
3
4       I, the undersigned authority, certify that the witness
5   personally appeared before me and was duly sworn.
6
7   WITNESS my hand and official seal this 2nd day of October, 2008.
8
9
10
11                          _____

```
                                MEDMARC.txt
12                              Julia Y. Alfonso
                                Notary Public-State of Florida
13                              My Commission:  DD 546636
                                My Commission Expires: May 28, 2010
14

15

16

17

18

19

20

21

22

23

24

25
                                                              47



1                    C E R T I F I C A T E

2

3    THE STATE OF FLORIDA)
     COUNTY OF MIAMI-DADE)
4

5
         I, Julia Y. Alfonso, Florida Professional Reporter, State of
6    Florida at Large, do hereby certify that the aforementioned
     witness was by me first duly sworn to testify the whole truth;
7    that I was authorized to and did report said deposition in
     stenotype; and that the foregoing pages, numbered from 1 to 47,
8    inclusive, are a true and correct transcription of my shorthand
     notes of said deposition.
9
         I further certify that said deposition was taken at the time
10   and place hereinabove set forth and that the taking of said
     deposition was commenced and completed as hereinabove set out.
11
         I further certify that I am not attorney or counsel of any
12   of the parties, nor am I a relative or employee of any attorney
     or counsel of party connected with the action, nor am I
13   financially interested in the action.

14       The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless under
15   the direct control and/or direction of the certifying reporter.

16   IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of
```
Page 40

MEDMARC.txt

October, 2008.

17

18

19

20        _____

21        Julia Y. Alfonso, FPR
          Notary Public - State of Florida
22        My Commission:    DD 546636
          My Commission Expires: May 28, 2010
23

24

25

Page 41